UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DEBORA WALTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-01888-JMS-MPB |
| | ) | |
| FIRST MERCHANTS BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Debora Walton, who is proceeding *pro se*, held several loans and bank accounts at Defendant First Merchants Bank ("FMB"). After FMB charged certain fees and ultimately closed Ms. Walton's accounts, she initiated this litigation. Ms. Walton has filed a Motion for Partial Summary Judgment on Count I, II, III and IIII (sic), [Filing No. 85], and a Motion for Partial Summary Judgment on the Following Counts I, II, III and IIII (sic), [Filing No. 104], and FMB has filed a Cross-Motion for Summary Judgment, [Filing No. 162]. All three motions are ripe for the Court's decision.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the

materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P.

56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not . . . imply that there are no genuine issues of material fact."  *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003).  Specifically, "[p]arties have different burdens of proof with respect to particular facts, different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial."  *Id.* at 648.

## II.
### EVIDENTIARY ISSUES

Before setting forth the facts relevant to the Motions for Summary Judgment, the Court will consider several evidentiary issues FMB raises in connection with the exhibits Ms. Walton relies upon.  This is necessary because the issues relate to the scope of information that the Court can consider in deciding the Motions for Summary Judgment.

### A.  Privileged Document

FMB argues that Ms. Walton improperly relies upon a document that it inadvertently produced during discovery, which she designates as "Exhibit L" to her first Motion for Partial Summary Judgment.  [Filing No. 163 at 7-8 (discussing Filing No. 87-10).]  FMB notes that after it inadvertently produced the document, it contacted Ms. Walton but she refused to return all copies, used the document in depositions, and then filed it as Exhibit L.  [Filing No. 163 at 7.]

3

FMB also points out that Ms. Walton was sanctioned for her use of the document and ordered to pay fees.  [Filing No. 163 at 8 (citing Filing No. 125).]

Ms. Walton responds that she had already received the document, and it was "submitted to the court and docketed" before FMB requested a protective order.  [Filing No. 172 at 8.]

The use of the document is governed by an earlier order of this Court.  The Magistrate Judge found in connection with Exhibit L that Ms. Walton "must…return any remaining copies of the documents to [FMB]."  [Filing No. 125 at 2.]  Accordingly, Ms. Walton was prohibited from continuing to use the document and should have returned all copies to FMB.  Her arguments as to why she may continue to use the document are unavailing – she only received the document because FMB inadvertently produced it, and the document was filed with the Court as an attachment to one of her filings (prior to its use in connection with her first Motion for Partial Summary Judgment).  [*See* Filing No. 64-4 at 2 (Ms. Walton attaching the document as an exhibit to her Motion to Compel).]  Ms. Walton is prohibited from using Exhibit L in connection with her Motions for Partial Summary Judgment, or for any other purpose, and is reminded that she must return all copies of the document to FMB or may be held in contempt of Court for failing to comply with the Magistrate Judge's August 6, 2018 Order.  [Filing No. 125.]  Accordingly, the Court **STRIKES** Exhibit L, [Filing No. 87-10], and will disregard all references to, and argument based upon, Exhibit L in Ms. Walton's briefing in connection with the pending Motions for Partial Summary Judgment.

### B.  AT&T Telephone Records

Ms. Walton attaches what she asserts are her home phone records and cellular phone records in connection with her summary judgment briefing.  [Filing No. 88-1; Filing No. 88-2; Filing No. 107.]  FMB argues that these records are hearsay and that Ms. Walton has not set forth

a foundation for an exception to the hearsay rule.  [Filing No. 163 at 9-10.]  It also asserts that Ms. Walton would not be able to authenticate the records with an affidavit or testimony from an AT&T custodian of records because she has altered the records by making certain parts of the records unreadable "in an attempt to highlight certain information."  [Filing No. 163 at 10.]  FMB also argues that Ms. Walton has not complied with Local Rule 56-1(e) and (h) because she has not provided citations to any of the AT&T records in support of the statements in her affidavit and briefs.  [Filing No. 163 at 10-11.]  Finally, FMB argues that Ms. Walton's statement that she received over 500 calls from FMB should be excluded because it relies on unauthenticated hearsay (the altered AT&T telephone call logs).  [Filing No. 163 at 12.]

The Court acknowledges that the AT&T phone records Ms. Walton submitted contain markings that likely alter their original form and make some of the phone numbers unreadable. [*See, e.g.*, Filing No. 88-1 at 3 ("Item 1304" showing a box with a "2" in it that obscures the "Terminating Number" for that item).]  However, even if Ms. Walton has produced records that have been altered from the records she received from AT&T – and FMB acknowledges she subpoenaed and received from AT&T on a CD, [Filing No. 163 at 6] – the Court finds, as discussed below, that Ms. Walton has provided sufficient other admissible evidence to create a genuine issue of fact regarding whether FMB placed multiple calls to her using an automatic telephone dialing system ("ATDS") even without relying on the AT&T records.  Accordingly, the Court need not decide whether the AT&T phone records are ultimately admissible at this juncture.  The Court cautions Ms. Walton, however, that the authenticity of the phone records she relies upon in connection with her Motions for Partial Summary Judgment may well be a valid issue at trial.  To the extent Ms. Walton plans to rely on such records at trial, she must ensure that they are admissible under the Federal Rules of Evidence.

### C.  Ms. Walton's Affidavit Filed With Her Reply Brief

FMB requests that Ms. Walton's Affidavit filed with her reply brief be stricken.  [Filing No. 177 at 8-11.]  To the extent statements in Ms. Walton's Affidavit contradict her sworn deposition testimony, the Court will not consider the contradictory statements in her affidavit.  *See Castro v. DeVry University, Inc.*, 786 F.3d 559, 571-72 (7th Cir. 2015) (statement in affidavit that contradicted earlier deposition testimony can be excluded as a sham where at the deposition the witness gave "clear answers to unambiguous questions which negate the existence of any genuine issue of material fact") (citation and quotation marks omitted).  These statements include:

- Ms. Walton's statement that "I went (sic) not provided with the complete Consumer Disclosure Booklet by [FMB] when they acquired Ameriana Bank," [Filing No. 170-1 at 3].  This is contradicted by Ms. Walton's deposition testimony that she received the disclosures in March 2016, when FMB and Ameriana merged, [Filing No. 163-1 at 8];

- Ms. Walton's statements that she did not voluntarily provide her cell phone number to FMB employee Donna Morrison, but that it instead was her home number, [Filing No. 170-1 at 3; Filing No. 170-1 at 5].  These statements are contradicted by Ms. Walton's deposition testimony that she voluntarily provided Donna Morrison with her cell phone number, [Filing No. 163-1 at 16-17];

- Ms. Walton's statement that "[e]very call I received from [FMB] on their Auto Dialer was not concerning my Loans," [Filing No. 170-1 at 3].  This contradicts Ms. Walton's deposition testimony that all of the calls she received that are the subject of this lawsuit were regarding her loan accounts, [Filing No. 163-1 at 23];

- Ms. Walton's statement that she did not receive any disclosures regarding a fee for receiving a paper statement from FMB.  [Filing No. 170-1 at 3.]  This contradicts her deposition testimony that she received the Consumer Disclosures attached to her Amended Complaint as Exhibit D, [Filing No. 163-1 at 8], which specifically disclose a $3.00 fee for "Account Activity Printout," [Filing No. 15 at 36]; and

- Ms. Walton's statements that she did not alter the AT&T records, [Filing No. 170-1 at 4].  These statements are contradicted by her deposition testimony detailing the actions she took to change the presentation of the information in the AT&T records, [Filing No. 163-1 at 13-15; Filing No. 163-1 at 23-27].

FMB also seeks to exclude Ms. Walton's statement in her Affidavit that "I do have recordings of [an FMB] employee concerning requesting the Bank stop calling me, on my home and cell phones," [Filing No. 170-1 at 4].   But the deposition testimony that FMB cites as contradictory is that Ms. Walton did not know if she had any of those calls recorded, that she "may have a call, recorded call, but I haven't located them yet," and that she would give any recordings to FMB.  [Filing No. 163-1 at 7.]   That testimony does not necessarily contradict Ms. Walton's statement in her Affidavit, so the Court will not exclude that statement.[1]

Additionally, FMB argues generally that Ms. Walton's statements in her Affidavit are "self-serving," including that she revoked her consent to be contacted by telephone.  [Filing No. 163 at 12; Filing No. 177 at 8.]  But the Seventh Circuit has repeatedly rejected that argument.  *See Sanders v. Melvin*, 873 F.3d 957, 960 (7th Cir. 2017) ("Everything a litigant says in support of a claim is self-serving, whether the statement comes in a complaint, an affidavit, a deposition, or a trial.  Yet self-serving statements are not necessarily false; they may be put to the test before being accepted, but they cannot be ignored.  Our opinion in *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013), recounts the circuit's flirtation with a doctrine that allows judges to disregard self-serving statements, and it overrules any precedents that so much as hinted in that direction.  It is dismaying to see plausible allegations labeled 'self-serving' and then swept aside after *Hill* and its predecessors….") (emphasis omitted).   The Court may not strike, and must consider, the statements in Ms. Walton's Affidavit that FMB merely labels as self-serving, but that do not contradict her earlier deposition testimony.

---

[1] The Court notes that if Ms. Walton has those recordings, but has not produced them, she faces potential consequences under the Federal Rules of Civil Procedure.

# III.
## BACKGROUND

The following factual background is set forth pursuant to the standard discussed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

Ms. Walton first became a personal banking customer at FMB on November 20, 2007, and ultimately opened three personal bank accounts: xxxx7387, xxxx5616, and xxx4736 (the "FMB Personal Accounts"). [Filing No. 179-1 at 1.][2]  Additionally, several corporate entities with which Ms. Walton was affiliated maintained business accounts at FMB, including: (1) AVS Inc., with account no. xxx6724; (2) AVS Inc., with account no. xxx8774; (3) Foxtrot Corporation, with account no. xxxx7562; (4) IConnect Inc., with account no. xxxx6096; and (5) IConnect Inc., with account no. xxxx8774 (the "FMB Business Accounts").  [Filing No. 179-1 at 1.]

---

[2] The Court's Practices and Procedures, which can be found on the Court's website, clearly set forth in Appendix A how to cite to exhibits in a brief.  www.insd.uscourts.gov.  FMB has not followed the Court's clear instruction, instead referring to exhibits by number and citing to their actual page or paragraph numbers instead of their ECF page numbers.  For example, for the date on which Ms. Walton first became its personal banking customer, FMB cited "Ex. 4, Horton, Affd., ¶ 4."  [Filing No. 163 at 3.]  Instead, the citation should be "Filing No. 179-1 at 1," which corresponds to the ECF number of the document, and the ECF page number where the cited material appears.  Similarly, Ms. Walton has not followed the Court's Practices and Procedures. While she sporadically provides the ECF number of the document to which she is citing, she often only provides the name and exhibit number of the exhibit, and the actual page or paragraph number as FMB does.  [*See, e.g.*, Filing No. 105 at 2 (Ms. Walton citing to "Exhibit 'A'; (Walton Aff ¶ 1)".]  The parties' failure to provide the form of citation the Court has specifically set forth in its Practices and Procedures made the Court's review of the pending motions unnecessarily cumbersome.  They are cautioned to comply with the Court's Practices and Procedures going forward in this and other cases.

In March 2016, FMB merged with Ameriana Bank ("Ameriana"), and accounts opened with Ameriana became accounts maintained by FMB. [Filing No. 179-1 at 1.] Prior to the merger, Ms. Walton had applied for and obtained two loans from Ameriana – one personal loan (the "Ameriana Personal Loan") and one business loan (the "Ameriana Business Loan"). [Filing No. 163-1 at 21; Filing No. 179-1 at 45-49.] Ms. Walton executed credit applications to open both the Ameriana Personal Loan and the Ameriana Business Loan. [Filing No. 179-1 at 1; Filing No. 179-1 at 45-46; Filing No. 179-1 at 48-49.] She provided telephone numbers on each of those applications. [Filing No. 179-1 at 45; Filing No. 179-1 at 48.] Ms. Walton also executed an InstaCash Agreement for each loan. [Filing No. 179-1 at 1; Filing No. 179-1 at 51-53; Filing No. 179-1 at 55-57.] Neither the credit applications nor the InstaCash Agreements stated what the loan payment dates would be. [Filing No. 179-1 at 1.] Ms. Walton requested that the payment for the Ameriana Personal Loan be due the fifth day of each month. [Filing No. 179-1 at 1.]

After the merger of FMB and Ameriana, FMB provided Ms. Walton with FMB's Consumer Disclosure Booklet (the "Consumer Disclosures"). [Filing No. 15 at 19-39; Filing No. 163-1 at 8; Filing No. 179-1 at 1-2.] The Consumer Disclosures contained disclosures regarding: (1) consumer liability for unauthorized electronic funds transfers; (2) the office to be notified when a consumer believes that an unauthorized electronic funds transfer has been made; (3) FMB's business days; (4) the types of electronic funds transfers and related limitations; (5) the applicable fees; (6) the consumers' rights to periodic statements; (7) the consumers' rights to stop payments; (8) FMB's liability for failure to make or stop certain transfers; (9) the circumstances under which FMB may disclose information to a third party; (10) error resolution; and (11) fees charged by an automated teller machine operator. [Filing No. 15 at 19-39; Filing No. 179-1 at 1-2.] It is FMB's practice to provide every banking customer with appropriate disclosures when they open an

account, and when FMB merged with Ameriana it was FMB's policy to provide every new banking customer with the Consumer Disclosures and a letter welcoming them as a new client. [Filing No. 179-1 at 2; Filing No. 179-1 at 81-87.]

In addition to the Consumer Disclosures, FMB also provided Ms. Walton with its overdraft disclosure titled "What You Need to Know about Overdrafts and Overdraft Fees" (the "Overdraft Disclosure"). [Filing No. 15 at 32; Filing No. 179-1 at 2; Filing No. 179-1 at 89.] The Overdraft Disclosure provided that: (1) a fee of up to $37 would be charged "each time [FMB pays] an overdraft or return[s] an item, with a limit of six charges per day"; (2) on the fourth business day an account is overdrawn, an $8 fee may be charged each business day that the account remains overdrawn, which is in addition to any overdraft item fees or returned item fees assessed; and (3) the $37 overdraft fee is not charged if the total overdraft is $5 or less. [Filing No. 15 at 32.] Ms. Walton opted into overdraft protection for the FMB Personal Accounts and the FMB Business Accounts on October 2, 2008 and again in 2010. [Filing No. 179-1 at 2; Filing No. 179-1 at 91; Filing No. 179-1 at 93.]

On May 25, 2017, FMB Vice President Robert Holland sent Ms. Walton a letter advising her that FMB was closing the FMB Personal Accounts and the FMB Business Accounts. [Filing No. 179-1 at 95.] This letter came after FMB sent Ms. Walton various notices that her loan accounts were delinquent, and charged her various fees related to her accounts. [Filing No. 179-1 at 97-172.]

Before closing her accounts, FMB also contacted Ms. Walton on her home or cellular telephone regarding her delinquent accounts. [Filing No. 179-1 at 2.] FMB used a system called

Ontario Guaranteed Contacts to make at least some of those calls. [Filing No. 163-8 at 5-6.][3] Ms. Walton had provided two phone numbers on her credit application. [Filing No. 179-1 at 1; Filing No. 179-1 at 45-46; Filing No. 179-1 at 48-49.]   Ms. Walton ultimately stopped using those telephone numbers. [Filing No. 163-1 at 20-21.] Ms. Walton later provided a cell phone number ending in 9633 to FMB. [Filing No. 163-1 at 16-17.] Every call that FMB placed to Ms. Walton was regarding the Ameriana Personal Loan or the Ameriana Business Loan. [Filing No. 163-1 at 23; Filing No. 163-7 at 2.] Ms. Walton "received over five hundred Robo Calls on [her] home phone from [FMB]," and "over five hundred Robo Calls on [her] cell phone from [FMB]." [Filing No. 87-1 at 3.][4] Ms. Walton asked several FMB employees to "please ask them to stop calling my

---

[3] FMB states in its brief in support of its Cross-Motion for Summary Judgment that it "uses a vendor, Ontario Systems, and its software program called Ontario Guaranteed Contacts to assist in keeping records of FMB's contacts with banking customers." [Filing No. 163 at 6.] FMB cites to "Horton Affd." for this proposition, without citing to where in the Horton Affidavit this information is discussed. [Filing No. 163 at 6.] In fact, in his affidavit submitted with FMB's brief, Mr. Horton does not mention Ontario Systems, Ontario Guaranteed Contacts, or any vendor or software used by FMB for keeping records of FMB's contacts with banking customers. [*See* Filing No. 179-1.] FMB also cites to "Ex. 2," which presumably means Exhibit 2 to its brief in support of its Cross-Motion for Summary Judgment. Exhibit 2 is excerpts from the deposition of Robert Holland, and Mr. Holland does not discuss Ontario Systems or Ontario Guaranteed Contacts in those excerpts. [Filing No. 163-2.] Indeed, there are numerous facts for which FMB provides citations to the record that do not relate to or support the facts set forth. For example, FMB cites to "Walton Dep. 213:13-14, 295:13-14" for the proposition that "[Ms. Walton's] business loan was Ameriana Bank account no. xxxx4415." [Filing No. 163 at 3-4.] Page 213 at lines 13 and 14 of Ms. Walton's deposition transcript attached as Exhibit 1 to FMB's brief provides the last sentence of an answer and a question, neither of which relate in any way to Ms. Walton's business loan. And while page 295 lines 13 and 14 show that Ms. Walton identified her credit application as Exhibit 38, FMB has not provided Exhibit 38, so the Court has no way of knowing whether the application reflects the existence of the account and the account number. The Court relies upon the parties – particularly represented parties – to provide accurate citations to the record. FMB is reminded that the Court is "not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. The Court will not consider "facts" that are set forth without proper citations to the record.

[4] FMB disputes that the calls were made by an ATDS and, as discussed below, the Court agrees that this fact is disputed.

11

cell phone," but as of the time of her deposition had not located any recording of any calls with FMB revoking her consent.  [Filing No. 163-1 at 6-7.]

Ms. Walton initiated this litigation in June 2017 and filed the operative Amended Complaint in August 2017.  [Filing No. 1; Filing No. 15.]  She asserts claims for: (1) breach of business and consumer contracts; (2) violations of Regulation E; (3) violation of the Telephone Consumer Protection Act ("TCPA"); and (4) violation of Indiana Code § 24-5-14-5.  [Filing No. 15 at 3-7.]

## IV.
### DISCUSSION

Ms. Walton moves for summary judgment on her Regulation E and TCPA claims, and FMB cross-moves for summary judgment on all of Ms. Walton's claims.  The Court will consider the parties' motions in connection with each claim, in turn.  At the outset, however, the Court addresses a general argument raised by FMB:  that it is entitled to summary judgment to the extent any of Ms. Walton's claims are asserted on behalf of corporations.  [Filing No. 163 at 13.] Specifically, FMB argues that Ms. Walton has no standing to bring claims on any corporate entity's behalf related to the FMB Business Accounts or the Ameriana Business Loan, even if she owns the corporate entity which owns those accounts or that loan completely.  [Filing No. 163 at 13.] Ms. Walton does not address this argument in her reply brief.  [See Filing No. 172.]

It is a well-established corporate principle that "'shareholders of a corporation may not maintain actions at law in their own names to redress an injury to the corporation even if the value of their stock is impaired as a result of the injury.'"  *Massey v. Merrill Lynch & Co., Inc.*, 464 F.3d 642, 645 (quoting *Barth v. Barth*, 659 N.E.2d 559, 560 (Ind. 1995)).  Put another way, "when a corporation suffers injury, either from corporate insiders or, as in this case, from a third party, it is the corporate entity – not the individual shareholders – who retains the cause of action."  *Massey,*

464 F.3d at 646.  Ms. Walton refers to business accounts that she opened on behalf of several corporations with which she is involved.  [*See, e.g.*, Filing No. 105 at 2 (Ms. Walton setting forth her "Material Facts Not in Dispute," which include that she opened a business account "as one of the Officer[s] of the Corporation….").]  Any claims Ms. Walton brings related to the business accounts or business loans fail as a matter of law, because those claims belong to the corporations that own those accounts or loans, and Ms. Walton may not assert them on the corporation's behalf.[5]  The Court **GRANTS** FMB's Cross-Motion for Summary Judgment and **DENIES** Ms. Walton's Motions for Partial Summary Judgment to the extent Ms. Walton's claims relate to the FMB Business Accounts or the Ameriana Business Loan.

### A.  Count I – Breach of Business and Consumer Contracts

In her breach of contract claim, Ms. Walton alleges that FMB breached her "Business Contract and Consumer Contract" by "[m]aking changes and a payment schedule to an existing Loan that was generated by a Lending Institution that [FMB] acquired," and that FMB "never provided disclosures of any changes to the Loan contracts nor notice to [Ms. Walton] about the terms of the changes to the Loan contracts."  [Filing No. 15 at 3-4.]  However, Ms. Walton does not address her breach of contract claim in either of her Motions for Partial Summary Judgment.  [*See* Filing No. 86; Filing No. 105.]

In support of its Cross-Motion for Summary Judgment, FMB argues that there is no evidence that FMB breached any contract with Ms. Walton.  FMB states that Ms. Walton's breach of contract claim relates to her contract with Ameriana prior to its merger with FMB, to the InstaCash or Loan Agreement, and, specifically, to FMB purportedly changing the loan payment

---

[5] FMB argues that "Walton concedes she has no standing to bring claims on behalf of a corporate entity," and cites to "Ex. 1, Walton Dep. 114:21-25."  [Filing No. 163 at 13.]  Exhibit 1 to FMB's brief, however, does not include page 114 of Ms. Walton's deposition transcript.

due date.  [Filing No. 163 at 14.]  FMB argues that the Loan Agreement does not state the date loan payments were due, and it was not a contractual term that could be breached.  [Filing No. 163 at 14.]  FMB also asserts that Ms. Walton has not alleged that any change in the payment due date damaged her.  [Filing No. 163 at 14.]

In her reply brief, Ms. Walton argues that the Vice President of Ameriana explained the terms of the Loan Agreement, and "informed [her] that her loan payments would be due on the 25th of each month."  [Filing No. 172 at 15.]  She asserts that Mr. Horton's statement in his affidavit that she requested that her loan payment date be changed to the fifth of every month "is just simply not true."  [Filing No. 172 at 15.]

FMB argues in its reply that the payment due date was not included in any contract related to the loans.  [Filing No. 177 at 14.]

In connection with her breach of contract claim, Ms. Walton points to Exhibit A to her Amended Complaint, which is her InstaCash Agreement with Ameriana and her Acknowledgement of Consumer Disclosure.  [Filing No. 15 at 10-13.]  Neither of these documents sets forth the due date for Ms. Walton's loan payments.  Her statement in her affidavit that the Vice President of Ameriana told her that her monthly payments would be due on the 25th of each month does not establish a contract including that term and, in turn, does not establish that FMB breached a contract by requiring payment on the fifth of each month.  Because FMB has challenged that any evidence exists to support the payment due date, and because Ms. Walton has not presented any undisputed admissible evidence of a contract that sets forth that her payments for the Ameriana Personal Loan were due on the 25th of each month, her breach of contract claim fails as a matter of law.  The Court **GRANTS** FMB's Cross-Motion for Summary Judgment on Ms. Walton's "breach of business and consumer contracts" claim.

**B.  Count II – Violations of Regulation E**

In her second claim, Ms. Walton alleges that FMB violated "Regulation E, including 12 C.F.R. 205 et, seq. and the Electronic Funds Transfer Act ["EFTA"], including 15 U.S.C. § 1693c; and 1693 et. seq.;, by charging [her] unauthorized fees." [Filing No. 15 at 4.]  Specifically, she alleges that FMB subtracted unauthorized charges from her checking account, which caused that account to have a negative balance, then "consistently charg[ed her] $8.00 per day."  [Filing No. 15 at 4.]  She alleges that FMB "unilaterally closed" her accounts when she disputed the charges and asked FMB to provide a disclosure relating to the charges.  [Filing No. 15 at 4.]

In support of her Motions for Partial Summary Judgment, Ms. Walton argues that FMB violated the EFTA by charging her overdraft fees because she did not opt in to overdraft protection, nor did she receive a disclosure related to the fees she was charged.  [Filing No. 86 at 8-13.]  Ms. Walton argues that "[FMB] initiated their own fee, to cover the cost of mailing [her] bank statements, of which [she] never received," and that "[FMB] is without authority to assess fees on [her] accounts, and to add more fuel to the fire, they continued to assess daily fees and issued demand notices two months after they closed the accounts."  [Filing No. 105 at 9.]  She asserts that FMB could not charge her for shortfalls in her accounts that FMB itself created.  [Filing No. 105 at 10.]

FMB argues in response and in support of its Cross-Motion for Summary Judgment that Ms. Walton testified that she received FMB's Consumer Disclosures in March of 2016, and that they contained all of the disclosures required by 12 C.F.R. § 1005.7.  [Filing No. 163 at 16.]  It also argues that 15 U.S.C. § 1683m(g) requires that any action under Regulation E be brought within one year of the date of the occurrence of the violation, and Ms. Walton did not bring her suit until more than a year after receiving the Consumer Disclosures.  [Filing No. 163 at 16-17.]

FMB contends that, in any event, it did not charge Ms. Walton any undisclosed or unauthorized fees. [Filing No. 163 at 17.] Specifically, it argues that the $3.00 fee to receive her paper statement is not addressed by Regulation E, that the overdraft fees and daily negative balance fees were disclosed to Ms. Walton in compliance with Regulation E in the Consumer Disclosures, and that Ms. Walton opted in to overdraft protection. [Filing No. 163 at 15-18.]

In her reply, Ms. Walton argues that FMB did not provide her with a disclosure of the $3.00 fee for receiving paper statements, and that she did not receive the statements in any event. [Filing No. 172 at 16.]

Regulation E provides that a financial institution must provide the following disclosures to consumers: (1) "A summary of the consumer's liability under § 1005.6 or under state or other applicable law or agreement, for unauthorized electronic fund transfers"; (2) "[t]he telephone number and address of the person or office to be notified when the consumer believes that an unauthorized electronic fund transfer has been or may be made"; (3) "[t]he financial institution's business days"; (4) "[t]he type of electronic fund transfers that the consumer may make and any limitations on the frequency and dollar amount of transfers. Details of the limitations need not be disclosed if confidentiality is essential to maintain the security of the electronic fund transfer system"; (5) "[a]ny fees imposed by the financial institution for electronic fund transfers or for the right to make transfers"; (6) "[a] summary of the consumer's right to receipts and periodic statements…and notices regarding preauthorized transfers…"; (7) "[a] summary of the consumer's right to stop payment of a preauthorized electronic fund transfer and the procedure for placing a stop-payment order…"; (8) "[a] summary of the financial institution's liability to the consumer…for failure to make or to stop certain transfers"; (9) "[t]he circumstances under which, in the ordinary course of business, the financial institution may provide information concerning

the consumer's account to third parties"; (10) "[a] notice that is substantially similar to Model Form A-3 as set out in appendix A of this part concerning error resolution"; and (11) "[a] notice that a fee may be imposed by an automated teller machine operator…, when the consumer initiates an electronic fund transfer or makes a balance inquiry, and by any network used to complete the transaction." 12 C.F.R. § 1005.7(b).  Ms. Walton bases her Regulation E claim on two fees that FMB charged to her: the $3.00 fee for paper bank statements, and the overdraft fees.

### 1. Paper Statement Fee

Regulation E does not require disclosure of a fee for receiving paper bank statements. Accordingly, even if FMB failed to disclose that fee to Ms. Walton, she cannot succeed on a claim for violation of Regulation E since the regulation does not require that specific disclosure.

### 2. Overdraft Fees

As to overdraft fees, Regulation E provides that "a financial institution holding a consumer's account shall not assess a fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service, unless the institution: (i) Provides the consumer with a notice in writing, or if the consumer agrees, electronically, segregated from all other information, describing the institution's overdraft service." 12 C.F.R. § 1005.17(b)(1)(i).  The notice of overdraft charges must include "[a] brief description of the financial institution's overdraft service and the types of transactions for which a fee or charge for paying an overdraft may be imposed, including ATM and one-time debit card transactions," the dollar amount of fees charged, the maximum number of overdraft fees or charges that may be assessed per day, an explanation of the consumer's rights to consent to the payment of overdrafts, and alternative plans for covering overdrafts.  12 C.F.R. § 1005.17(d).

Ms. Walton argues in connection with her Motions for Partial Summary Judgment that she did not receive disclosures related to FMB's overdraft policy and did not opt in to overdraft protection. Because Regulation E only applies to overdraft charges for ATM or one-time debit card transactions, the only potential claim Ms. Walton could have under Regulation E for overdraft charges would be related to the FMB Personal Accounts and not the Ameriana Personal Loan. While Ms. Walton's Regulation E claim is murky, and it is not clear whether it relates to the FMB Personal Accounts, the Ameriana Personal Loan, or both, the Court concludes it cannot be applied to the Ameriana Personal Loan. The Court will only consider the Regulation E claim with respect to the FMB Personal Accounts.

a.   Whether Ms. Walton Received Disclosure of FMB's Overdraft Policy

Ms. Walton's testimony indicates that she received disclosures of FMB's overdraft policy after FMB and Ameriana merged. [*See* Filing No. 163-1 at 8 (Ms. Walton testifying that she received the disclosures relating to overdraft protection in March 2016, after the FMB/Ameriana merger, which are part of Exhibit D to her Amended Complaint).] Those disclosures specifically state under a section titled "What fees will I be charged if First Merchants Bank pays my overdraft?" that "an $8 fee may be charged each business day your account remains overdrawn. This charge is in addition to any Overdraft Item Fees or Returned Item Fees assessed." [Filing No. 15 at 32.] So any Regulation E claim related to not receiving a disclosure of FMB's overdraft protection policy fails as a matter of law.[6]

---

[6] The Court reads Ms. Walton's claims related to overdraft charges as applying to charges assessed after the FMB/Ameriana merger – and, consequently, after Ms. Walton received notice of FMB's overdraft policy. To the extent Ms. Walton bases her claims on charges assessed before the merger, those claims would be time-barred in any event. *See* 15 U.S.C. § 1693m(g) ("[A]ny action under this section may be brought…within one year from the date of the occurrence of the violation").

b.  <u>Whether Ms. Walton Opted Into Overdraft Protection</u>

As to whether Ms. Walton opted into overdraft protection for the FMB Personal Accounts, FMB provides two documents which it argues indicate that Ms. Walton opted into overdraft protection.  Exhibit M to Mr. Horton's Affidavit, signed by Ms. Walton on October 3, 2008, indicates that she was signing a "new authorization" for funds to be transferred from account xxxxxx7379 to account xxxxxx7387 for overdraft protection.  [Filing No. 179-1 at 91.]  Exhibit N to Mr. Horton's Affidavit, which Mr. Horton calls a "form" in his Affidavit, appears to be an email from Carolyn Rankin to Account Services reflecting that "Deborah M. Loy"[7] completed her "Reg E Opt In/Opt Out" on August 9, 2010, and that she opted into overdraft protection for all of her accounts.  [Filing No. 179-1 at 93.][8]  While Ms. Walton does not cite to any record evidence indicating that she did not opt in to overdraft protection and, notably, her Affidavit does not discuss whether or not she opted in, [Filing No. 87-1 at 2-3],  Ms. Walton testified that Exhibit N, relied upon by FMB, lists a social security number that is not hers.  [Filing No. 163-1 at 18.]  The Court

---

[7] The Court is mindful that Ms. Walton has submitted evidence in support of her claims which refers to her as Deborah M. Loy.  *See, e.g.,* Exhibit A to her Amended Complaint, [Filing No. 15 at 11].  But the social security number discrepancy, as discussed below, remains in dispute.

[8] FMB also provides two citations to Ms. Walton's deposition transcript for the proposition that she opted into overdraft protection.  The first, "Ex. 1, Walton Dep. 280:5-23," [*see* Filing No. 163 at 5], includes testimony in which Ms. Walton identifies her signature on "Exhibit 26" and acknowledges that the form she signed says "Automatically transfer Dynamic on the overdraft protection."  [Filing No. 163-1 at 18.]  FMB does not provide Exhibit 26, so the Court cannot examine that document.  The second citation, "Ex. 1, Walton Dep. ¶ 26," [*see* Filing No. 163 at 18], is yet another incorrect citation in FMB's brief.  There is no paragraph 26 to the Walton deposition transcript.  To the extent FMB means to cite to "Exhibit 26" to the Walton deposition transcript, as already noted, it has not provided Exhibit 26.

finds that a genuine issue of fact exists regarding whether Ms. Walton opted into overdraft protection for the FMB Personal Accounts.[9]

In sum, Ms. Walton's Motions for Partial Summary Judgment as they apply to the charge for paper statements are **DENIED**, and FMB's Cross-Motion for Summary Judgment as it applies to that claim is **GRANTED**, since Regulation E does not require disclosure of that type of fee. Additionally, Ms. Walton's Motions for Partial Summary Judgment as they apply to FMB disclosing its overdraft protection policy are **DENIED**, and FMB's Cross-Motion for Summary Judgment as it applies to that claim is **GRANTED**. Finally, Ms. Walton's Motions for Partial Summary Judgment on her claim for violation of Regulation E as it applies to overdraft protection charges are **DENIED**, and FMB's Cross-Motion for Summary Judgment on that claim is **DENIED**, because genuine issues of material fact exist precluding summary judgment.

### C. Count III – Violation of the TCPA

In Count III, Ms. Walton alleges that FMB violated the TCPA by "call[ing] [her] cellular telephone number using an ATDS or predictive dialer." [Filing No. 15 at 5.] She alleges that when she answered calls from FMB, "she heard silence before [FMB's] telephone system would connect her to the next available representative or disconnect the call." [Filing No. 15 at 5.] Ms. Walton alleges that she was "annoyed, harassed and inconvenienced by [FMB's] continued calls." [Filing No. 15 at 5-6.]

In support of her Motions for Partial Summary Judgment on her TCPA claim, Ms. Walton argues that she received calls between March 2016 and June 2017, and that FMB did not have a

---

[9] The denial of summary judgment for FMB on this claim is perhaps more a function of the nature of the briefing rather than the strength of Ms. Walton's case. This may well be an issue that can be cleared up through testimony at trial regarding the social security number discrepancy. But, at the summary judgment stage, an issue of fact remains.

signed consent form from her.  [Filing No. 86 at 14.]  She asserts that Mr. Horton testified that FMB "auto dialed" her.  [Filing No. 86 at 15.]  She also argues that she only provided her cellular telephone number in connection with the business accounts she opened "as an Officer of the Corporation," and never in connection with her personal accounts.  [Filing No. 105 at 12.]

In support of its Cross-Motion for Summary Judgment, FMB argues that Ms. Walton voluntarily provided her phone numbers at various times in connection with the Ameriana Personal Loan, and that Ms. Walton admits that all of the calls to her home and cellular phone were related to her delinquent loans.  [Filing No. 163 at 19.]  FMB argues that providing a telephone number in a credit application is express consent to receiving calls, and that when Ms. Walton provided those numbers to Ameriana, that consent transferred to FMB through the merger.  [Filing No. 163 at 19-21.]  FMB argues that Ms. Walton's statement in her Affidavit that she revoked her consent is "self-serving" and cannot create a genuine issue of fact.  [Filing No. 163 at 23.]  FMB also argues that Ms. Walton has not shown that it used an ATDS to make the calls and that, even if she had made that showing, she has not shown that she received a call on her residential landline which used an artificial or prerecorded voice.  [Filing No. 163 at 24-26.]  FMB contends that Ms. Walton has not met her burden of showing that she received calls regarding the Ameriana Personal Loan, and that the calls could have also related to the Ameriana Business Loan.  [Filing No. 163 at 26-27.]  Finally, FMB argues that Ms. Walton has not shown that she received calls because she cannot rely on the inadmissible AT&T phone records.  [Filing No. 163 at 27.]

Ms. Walton reiterates her arguments in her reply brief, and stresses that she never gave FMB her consent to be contacted by telephone.  [Filing No. 172 at 17-30.]

21

In its reply, FMB also reiterates its arguments and asserts that Ms. Walton's Affidavit submitted with her reply brief should be stricken because it is "self-serving" and contradicts her prior sworn testimony.  [Filing No. 177.]

In relevant part, the TCPA prohibits any person from using an ATDS to make non-emergency calls "to any telephone number assigned to…cellular telephone service…or any service for which the called party is charged for the call…."  47 U.S.C. § 227(b)(1)(A)(iii).  The TCPA also prohibits any person from initiating a telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless under certain circumstances not present here.  47 U.S.C. § 227(b)(1)(B).  But the Court does not read Ms. Walton's TCPA claim as relating to calls to her residential landline.  Her allegations in the Amended Complaint relate solely to calls to her cell phone.  [*See* Filing No. 15 at 4-6.]  Additionally, she only mentions calls to her cell phone in her Statement of Claims.  [Filing No. 94 at 3-4.]  Accordingly, the Court finds that Ms. Walton's TCPA claim relates only to calls to her cellular telephone, and disregards FMB's arguments related to calls to Ms. Walton's residential landline.  Ms. Walton is foreclosed from asserting a TCPA claim, or making arguments, based on calls to her residential landline going forward in this matter.

To prove her TCPA claim, Ms. Walton must establish that: (1) FMB placed a call to her cell phone; (2) FMB used an autodialer or an artificial or prerecorded voice; and (3) the call was made without Ms. Walton's consent.  *Blow v. Bijora, Inc.*, 855 F.3d 793, 798 (7th Cir. 2017) (quoting 47 U.S.C. § 227(b)(1)(A)(iii)).  First, FMB does not appear to dispute that it called Ms. Walton's cell phone.  While it challenges the admissibility of the AT&T phone records, it does not deny that it called Ms. Walton's cell phone, as Ms. Walton testifies to her in her Affidavit.  [*See* Filing No. 87-1 at 3 (Ms. Walton stating in her Affidavit "I received over five hundred Robo Calls

on my cell phone from [FMB] according to the telephone call logs I received from AT&T").] While FMB challenges Ms. Walton's reliance on the AT&T records, the admissibility of those records as evidence is a separate issue.  Ms. Walton may base her knowledge regarding how many calls she received on her cell phone on the AT&T records, without those records being admissible. At the very least, Ms. Walton's statement in her testimony that she received over 500 calls from FMB on her cell phone creates a genuine issue of fact regarding the first element of her TCPA claim.

Second, as to whether FMB used an ATDS, the Court finds that there is a genuine issue of material fact regarding whether that was the case.  Ms. Walton relies upon testimony from FMB's corporate representative regarding FMB's use of Ontario Guaranteed Contacts to make calls to customers.  [*See, e.g.*, Filing No. 172 at 17-19 (quoting the deposition testimony of Mr. Horton).] But Mr. Horton's testimony does not establish that Ontario Guaranteed Contacts used an ATDS – indeed, he testified that he did not know whether Ontario Guaranteed Contacts met the legal definition of an auto dialer.  [Filing No. 170-5 at 4-5.]  For its part, FMB does not present any evidence that it did not use an ATDS – it merely argues that Ms. Walton has not proven that it did. FMB appears to confuse the standard on summary judgment.  While Ms. Walton would have needed to, among other things, provide evidence that FMB used an ATDS to call her cell phone in order to prevail on summary judgment on her TCPA claim, she does not need to do so in order to defeat FMB's summary judgment motion.  She need only establish that a genuine issue of fact exists regarding whether FMB used an ATDS.  Because neither Ms. Walton nor FMB present evidence establishing whether FMB used an ATDS, a genuine issue of fact exists regarding this element of Ms. Walton's TCPA claim.

Third, Ms. Walton must establish that the calls were made without her consent in order to succeed on her TCPA claim. FMB points to Ms. Walton's loan applications, and argues that because Ms. Walton provided her cell phone number on the applications, she consented to the calls. FMB cites to Mr. Horton's Affidavit for the proposition that Ms. Walton provided her cell phone number to FMB in her loan application and, accordingly, gave consent to being contacted on that phone. But Mr. Horton simply testifies that Ms. Walton "voluntarily provided two telephone numbers" on her credit applications. [Filing No. 179-1 at 1.] He does not state that one of those numbers was a cell phone or, more specifically, that one of the numbers was the number FMB called to discuss the Ameriana Personal Loan that is the subject of her TCPA claim. Additionally, Ms. Walton states in her Affidavit that she called FMB "on several occasions, requesting they stop call[ing] me, and I told them that the Auto Dialer was causing me to drop calls." [Filing No. 170-1 at 4.] Due to the lack of clarity with the evidence presented by both sides – *i.e.*, whether the cell phone number Ms. Walton provided was the cell phone number FMB called, and whether Ms. Walton requested that FMB stop contacting her through that number – the Court finds that a genuine issue of material fact exists regarding whether the calls that are the subject of Ms. Walton's TCPA claim were made without Ms. Walton's consent.[10]

Because genuine issues of fact exist regarding several of the elements of Ms. Walton's TCPA claim, the Court **DENIES** Ms. Walton's Motions for Partial Summary Judgment and **DENIES** FMB's Cross-Motion for Summary Judgment on that claim.

---

[10] Neither side presents conclusive evidence regarding whether the calls FMB placed to Ms. Walton related to the Ameriana Personal Loan, the Ameriana Business Loan, or both. At trial, Ms. Walton will need to show that the calls related to the Ameriana Personal Loan because, as discussed above, she does not have standing to assert claims on behalf of the corporations with which she is affiliated.

### D.  Count IV – Violation of Indiana Code § 24-5-14-5

In her Amended Complaint, Ms. Walton alleges that FMB has violated Ind. Code § 24-5-14-5.  In support of her Motion for Partial Summary Judgment, Ms. Walton argues that "[a]ccording to the Indiana IC § 24-5-14-5, Auto Dialer[s] are prohibited in the State of Indiana, and the Defendant continues to ignore State law."  [Filing No. 86 at 16.]

FMB argues in support of its Motion for Summary Judgment that Indiana's version of the TCPA does not provide a private right of action, and that only the attorney general can bring a claim under the statute.  [Filing No. 163 at 28.]

Ms. Walton does not address this claim in her reply brief, which FMB argues indicates that she does not oppose its request for summary judgment on that claim.  [Filing No. 172; Filing No. 177 at 19.]

Indiana Code § 24-5-14-1, *et seq.* (the "Indiana Autodialer Law") prohibits the use of "automatic dialing-announcing devices" in various circumstances.  The section that Ms. Walton relies upon, § 24-5-14-5, provides:

> A caller may not use or connect to a telephone line an automatic dialing-announcing device unless:
>
> (1) the subscriber has knowingly or voluntarily requested, consented to, permitted, or authorized receipt of the message; or
>
> (2) the message is immediately preceded by a live operator who obtains the subscriber's consent before the message is delivered.

Ind. Code § 24-5-14-5(b).

Courts have not recognized a private right of action under the Indiana Autodialer Law, and the plain language of the statute indicates that no such right of action exists.  *See* Ind. Code § 24-5-14-13 ("A caller who violates this chapter commits a deceptive act that is actionable by the attorney general under IC 24-5-0.5-4…."); *see also Patriotic Veterans, Inc. v. Indiana,* 736 F.3d

1041, 1044 (7th Cir. 2013) (noting that "[t]he Attorney General of Indiana may enforce the [Indiana] Autodialer Law by imposing various penalties…."). Because no private right of action for a violation of the Indiana Autodialer Law exists, Ms. Walton's claim for violation of Indiana Code § 24-5-14-5 fails as a matter of law. FMB's Cross-Motion for Summary Judgment on that claim is **GRANTED**.

## V.
### CONCLUSION

For the foregoing reasons, Ms. Walton's Motions for Partial Summary Judgment are **DENIED**, [85; 104], and FMB's Cross-Motion for Summary Judgment, [162], is **GRANTED IN PART** and **DENIED IN PART** as discussed above. No partial final judgment shall issue at this time.

The following claims will proceed to trial: (1) the Regulation E claim (Count II) as it relates to the legality of overdraft charges for the FMB Personal Accounts (*i.e.*, whether Ms. Walton opted into overdraft protection); and (2) the claim for violation of the TCPA (Count III) for calls made to Ms. Walton's cell phone regarding the Ameriana Personal Loan.

Given the significant narrowing of Ms. Walton's claims, the Court requests that the Magistrate Judge confer with the parties at his earliest convenience regarding possible resolution of the remaining claims short of trial.

Date: 11/28/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**<u>Distribution via ECF only to all counsel of record</u>**

**<u>Distribution via United States Mail to</u>:**

Debora Walton
P.O. Box 598
Westfield, IN 46074


Magistrate Judge Brookman